United States District Court
Eastern District of Missouri

United States of America
Plaintiff

v.

James Bowen
Defendant, Pro Se

RECEIVED
JAN 22 2021
BY MAIL

Case Number
4:16-CR-00106-RLW

Second supplement to Exigent and Emergent motion

James Bowen tenders this motion to include information to this matter, previously unavailable, which bears great significance and relevance for this court's consideration.

Bowen has experienced a series of medical conditions and maladies that have significantly affected his ability to walk, think, or to provide himself with basic means of self care, over the past couple of years. Recently, after experiencing yet another of his fainting spells and loss of consciousness, Bowen was seen by Forrest City medical staff and scheduled for further examination at an off-site hospital.

On 12/28/20, Bowen was taken to the Forrest City Medical Center where he was given a series of examinations including a CAT scan. While the physician's found no serious abnormalities with his heart functioning, the attending physician discovered:

> "[A] rather large cancerous tumor on [your] left lung, right next to your heart, and there are numerous smaller tumors surrounding it which indicate [the cancer] is starting to spread."

The emergency room physician contacted the prison and directed Ms. Yates, of Health Services, to seek further treatment for Bowen's cancer through a local Oncologist. The medical records and DVD of the hospital's CAT scan have been given to the prison. Bowen asks that this court include his cancer as part of its RIS considerations.

I.  **The internal inspections done by the DOJ-OIG in conjunction with the press coverage of the BOP's handling of the pandemic could not be more clear, the BOP has not stopped the outbreak, and are ill-equipped to handle this crisis.**

A recent and subsequent review of the DOJ-OIG report was made by national officials. Negative insight into the BOP's overall ability to protect or provide treatment to staff and prisoners proved to be staggering. The overwhelming consensus to the investigative findings at FCI Lompoc was that the same or similar circumstances exist wtih similar conditions at all BOP facilities. This is because the precautionary phases and plans used by the BOP have been implemented across the BOP's system of prison facilities.

> "The recent Office of Inspector General Report made clear the BOP's response to slowing the spread of COVID-19 at FCI Lompoc was hampered by understaffing of medical personnel...something one would think would have been part of phase one planning in January. Another thing that continues to be lacking in the BOP's plan is a testing protocol for both inmates and staff. If inmates show signs of COVID-19, they might be tested...they might not. If they were exposed to a positive staff member or another inmate, they might be tested...they might not. If an inmate has a high fever, he/she will be isolated for sure but they may not be tested but instead assumed to be positive. Members of the staff? According to a June 2020 Senate testimony from Jeffery Allen M.D., BOP Medical Director, said that the BOP does not test employees as doing so would limit the medical staff's ability to provide healthcare to the inmates. In those select prisons where there has been widespread testing, the number of positive results were staggering."

(www.forbes.com/sites/walterpavlo/2020/08/07as-bureau-of-prisons-enters-phase-9-of-covid-19-plan-bop-staff-wonder-if-there-is-a-real-plan-#77ca6b68326f (last visited 9/01/20)).

It is the BOP's rote handling of the COVID-19 epidemic that is so dangerous to prisoners lives. One recent court of appeals decision found this practice tobe appalling that it chose to broaden the expansive authority given to the courts allowing them to determine, on their own, what factors and conditions constitute extraordinary and compelling reasons justifying relief.

a.  This recent court decision has set forth at least one additional standard for relief when it can be shown that the BOP cannot or will not protect those prisoners under its custodianship. (United States v. Zullo 19-3218 2nd Cir. 2020).

The court found Congress never defined what is "extraordinary and compelling" under the FIRST STEP ACT. It further discovered that the Untied States Sentencing Commission never amended their guidelines after passage of the FIRST STEP ACT because they do not have a quorum of voting members to change them. Given this, it realized that individual courts faced with the same types of claims have determined that the Commission lacks an applicable policy statement regarding when a court can grant a compassionate release and that there has been significant movement within these other courts in correcting this problem.

Once such significant ruling opined that the mere possibility of contracting a communicable disease, such as COVID-19, could constitute an extraordinary or compelling reason justifying release if the defendant could show the prison (BOP) will not or cannot guard against or treat such a disease. (see United States v. Korn, 2020 WL 1808213 at 6 (W.D.N.Y. April 9, 2020); also United States v. Carver 2020 WL 1892340 (E.D. Wash. April 8, 2020).

In finding recognition of the BOP's unwillingness or inability to guard or treat those under its care, these courts have now established that the reviewing district court can determine whether any extraordinary and compelling reasons, other than those delineated in USSG 1B1.13 A-C warrant granting relief and that this independent determination is authorized pursuant to the sentencing Commission's application note 1(D) better known as the 'catch-all' provision.

The issues presented before this court today support a finding consistent with this judicial trend.

## II. The FIRST STEP ACT does not impose constraints on what a court may consider in modifying a sentence.

A defendant's good behavior and productive conduct that occurred after an offense is material and relevant to a court's overall determination in modifying a sentece once it is imposed. 18 U.S.C. § 3582 (c)(1)(B), which depends on the statute authorizing the reduction, has no limitations per se under the FIRST STEP ACT. It is therefore important and necessary that this court consider and adopt the most recent information and formal evaluation of a defendant's conduct instead of relying solely upon a defendant's PSR which may well be years or decades old and may not adequately reflect his current condition.

Since it is necessary for a court to consider a person's history and conduct in crafting a sentence, section 404's silence regarding the standard the courts should use in determining to reduce a sentence cannot be read to limit the information that courts may consider unlike the constraints found in §§ 3582(c)(1)(A) and (c)(2). In a recent opinion by District Court Judge Christopher Boyko of the United States District Court for the Northern District of Ohio, his honor said;

> "It would be inappropriate to impute the substantive standards contained in §§ 3582(c)(1)(A) and (c)(2) to § 3582(c)(1)(B) or to draw a negative inference from the fact that § 3582(c)(1)(B) does not contain any substantive standard."

In other words, just because § 3582(c)(1)(B) doesn't say that courts can use the § 3553(a) factors, does not mean a court cannot do so. This holding is consistent with the Supreme Court's decision in Pepper v. United States (562 U.S. 476, 2011) which held that courts may consider post-sentencing conduct under the § 3553(a) factors when resentencing during a § 3582(c)(1)(B) sentence modification proceeding.

This petitioner asks this honorable court to give weighty consideration to his DOJ-BOP conduct record, education history, and employment service history for

time spent from his incarceration date. In reviewing these records this court shall find supportive, fact-based justification for a finding that defendant is not only productive and compliant with the rules of his carceral environment, but that he is also a trustworthy model candidate for post-carceral supervision by this court.

### III. The current medical isolation and quarantine confinement practices at FCI Forrest City are harmful and dangerous per se.

The prison's current practice of medical quarantine for coronavirus infected prisoners is to mass confine groups of similarly infected persons in housing units of 160 or more. This regime serves as the greatest vector for reinfection of prisoners by exposure to each other and serves as an outlet of community transmission through the prison staff who must work amongst the herds of these confined persons.

A recent study by David H. Cloud, J.D., M.P.H. et alia also discovered that this practice under COVID-19 conditions causes more harm than previously realized. Social isolation, lack of programming and exercise, physical idleness, and other forms of sensory deprivations under this type of quarantine leads to immense psychological suffering and lasting trauma. Cloud reports this leads to a greater likelihood of self-harm, violence, and suicide, even after only relatively short periods of time. But even if a prisoner did not suffer this extreme, there are other passive self-harming activities that are even more prevalent.

Nearly all FCI Forrest City prisoners are reluctant to report symptoms to medical staff for fear of being placed in solitary or near solitary confinement under primitively punitive conditions. This is so because the prison offers no treatment for Coronavirus sickness, only monitoring. Prisoners are made to rely on the commissary for their pharmaceuticals and access to that is reigned back to once every 3 weeks. To make matters worse, pharmaceuticals may only be purchased in minor quantities lasting only several days and causing each anguished prisoner

to endure an insufferable wait until his next shopping day. Of course, since there are no inmate jobs to pay for medications this complication only applies to prisoners whose family provides them with funds to buy the high priced commissary OTC medications.

Prisoners have found the punishment they receive for self-reporting to be undesireable. Better to remain in a crowded, infected group where prisoners could share medications that to be placed in a concrete warehouse without access to these basic necessities where there will be no treatment provided to them anyway.

On or about October, 2020 the BOP has reported the Forrest City prison to be 'recovered' and initiated the reinstitution of visitation activities to prisoners and their families effective October 3, 2020. What is not reported is that the interior of the prison remains on lockdown/quarantine status and the CDC's medical tents are left standing for use. The hot water has been turned off beginning 9/14/20 and prisoners have been offered a hot shower only once, on 10/01/20, until 10/20/20 when inmate complaints overwhelmed the prison administration to turn the hot water back on. During this time period, most prisoners opted to forego their showers and hygiene and have resolved themselves to a fate they are unable to overcome due to this series of neglect when guards and staff concern themselves with their families and their own interests, considering prisoners to be only a tertiary transient concern.

### IV.   Current medical science shows that reinfection by Coronavirus is not only possible, but likely.

The BOP has recently instituted a practice of prisoner transfers between infected prisons and has standardized a practice of communally housing prisoners under a theory they will develop herd immunity. The danger posed to prisoners under this regime cannot be overstated in light of recent science showing recovered Coronavirus patients can become reinfected. (report by Erika Edwards and Akshay Syal, "COVID-19 reinfection reported in Nevada patient" 8/28/20; see also Kai Kupfer-

schmidt, "Some people can get the pandemic virus twice." study suggests (Aug. 24, 2020), sciencemag.org/news/2020/08.

The current state of affairs within the BOP is akin to playing Russian Roulette with prisoner's lives. Without offering care and treatment for the disease and its promotional efforts to propagate the transmission of COVID-19 internally, the BOP is advancing a scheme to directly and indirectly infect prisoners that is substantivel unconscionable. Not only has this practice been recognized and denounced by the National OSHA board, the DOJ-OIG, and the prison guard's union, but should be recognized by this court as an unconstitutional, illicit attempt to sufficiently increase the severity of each prisoner's sentence beyond what was originally anticipated. Executive lawmaking and imposition by decree violate the constitutional separation of powers doctrine and, in this case, pose significant 8th Amendment transgressions warranting correction and relief. If allowed to continue, resentencing by this court to include these novel exposure conditions as part of its sentencing consideration may soon become a forced trend to compensate for the BOP's wrongful practices.

## V.     An asymptomatic Coronavirus patient is not unaffected by COVID-19, but rather often suffers persistent, long-term disabling health problems.

Symptomatic presentations serve as indicators to the various areas of the body being affected by the Coronavirus disease. But, recent research reveals a category of patients who suffer slow developing, long-term neurological, respiratory, and cardiological degeneration. These patients are referred to as Covid 'long-haulers' and have been shown to suffer extreme forms of disability and death even after supposedly recovering from the initial infection.

The BOP has recently experience this phenomena after having 4 separate prisoners die from COVID-19 just 1-3 weeks after prison medical staff have declared them to be recovered.

On or about 9/20/20 at FCI Edgefield, Barry Johnson was declared recovered

from his Coronavirus disease using the BOP's time-lapse recovery criterion. Soon after, he experienced physical problems including confusion and trouble breathing. The prison declared him stable and attributed his difficulties to non-COVID reasons. But, just one week later, Johnson died at a local hospital due to his Coronavirus related injuries. In June of 2020 at FMC Lexington inmate Tom Krebs was declared recovered. However, on 9/17/20, Krebs was declared dead at a local hospital due to his COVID-19 infection. On or about 9/12/20 Ricky Miller at FCI Butner was pronounced dead due to COVID-19. His records show he had been declared recovered by the BOP just 1 month prior in the same manner as the other federal prisoners. Finally, on 8/26/20 at the Carswell prison in Texas, Marie Neba died at a local hospital due to her Coronavirus infection. The BOP's handling of Neba was strongly criticized by the local hospital staff when staff members discovered Neba was previously declared recovered yet suffered a severe decrease in her breathing which was largely ignored by the prison. It is reported one nurse at the hospital was so outraged that she took it upon herself to break protocol and allowed Neba to use the nurse's cellphone to call her children to say goodby shortly before she died.

    Sadly, these examples demonstrate the BOP's overall handling of this epidemic is not only beyond their control, but is further complicated by their practice of non-treatment, reliance on self reporting, and their general refusal to adopt the effective medical practices necessary to save the lives of those prisoners whom they expose to this lethal contagion. This travesty must be addressed and corrected by the court.

    Scientists at the Oakridge National Laboratories have explained these types of deaths as the host body's triggering of a 'Bradykinin' storm in response to the Coronavirus infection. This internal reaction interferes with a chemical that regulates blood pressure and throws respiratory, gastrointestinal, and neurological pathways off balance with lethal consequences. (livescience, the new Coronavirus can infect brain cells, study finds 9/13/20). These facts should neither be ignored nor dismissed

as irrelevant. Prisoners are dying while the BOP's records attempt to declare entire prisons recovered with the assistance of an illegitimate, false reporting scheme of recovery. As recently as 10/26/20 48 prisoners and 1 staff member were discovered to be infected in yet another outbreak at FCI Forrest City Low.

**VI.     A hearing to determine the extent of medical facts and to determine present dangerousness under § 3142(g) and § 3553(a) is warranted at this stage.**

The defendant asks the court to reject the government's position that he has not demonstrated extraordinary and compelling reasons warranting reduction and that he remains a danger to the community. These issues can only independently be determined by the court through a hearing. He therefore asks the court to appoint counsel, brief the issues, and conduct a hearing. Alternatively, that the court grant his request for compassionate release.

Nothing in the law holds United States Sentencing Guidelines as mandatory post Booker, and since policy statements are not law, this court's independent determination whether extraordinary and compelling reasons exist is unlimited following passage of the FIRST STEP ACT. But, the court must include a hearing to ascertain the medical validity of defendant's claim as well as the conditional factors which render the defendant unable or incapable of self-care.

**a.     Medical determination.**

In deciding what constitutes extraordinary and compelling reasons for compassionate release, it is required for the district court to conduct a hearing with regard to medical issues of fact, based on expert testimony with regard to his medical conditions, before making a final determination, expecially one denying relief to the defendant. A hearing is required because claims asserting medical facts ultimately ask the court to put itself in the difficult position of making a medical assessment

it is simply not qualified to make. However, at a hearing after being fully briefed by competent counsel and having heard expert medical testimony-ensures fairness in due process sentencing matters such as this one. Absent such a hearing, a court's disfavorable determination that a medical condition, in combination with an inability to provide self-care or to seek and receive sick call, does not qualify for relief- is a medical assessment and determination of qualifying medical factors and violative of the fair hearing process contemplated under § 3142(g).

b.  **Dangerousness and current sentencing factors.**

The court may not reduce a defendant's sentence unless it finds that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." This is a pre-trial detention statute that requires a hearing to determine dangerousness based on several factors (§ 3142(g)(1)-(4)). Similarly, a court's resolution of issues under § 3553(a) obliterates fundamental fairness without conducting a new hearing on the issues.

For the court to make an independent assessment of current dangerousness posed by a defendant without a hearing would deprive a defendant of a fundamentally fair adversarial process-something due process requires. Further, any supposed dangerousness posed by the defendant is extensively mitigated by the far reaching restraints placed on him by his supervision conditions and by any confines placed by compliance with State laws governing his post-release conditions. In fact, it could be logically and reasonably argued that these significant restraints of liberty upon release make the defendant much less of a potential or actual threat than the average defendant.

Under § 3142(g), current dangerousness with regard to pre-trial detention can only be ascertained through an adversarial process at a hearing with both sides presenting arguments for or against detention. While § 3582(c)(1)(A) contemplates dangerousness under § 3142(g), this would logically mean 'current' or 'present'

dangerousness-something that can only be determined in a hearing. Without such, the court takes a backward looking view without considering current circumstances. It is therefore error for the court to deny compassionate release on the pretense of current dangerousness without conducting a hearing consisting of input from the defendant and the government.

As with a dangerousness determination, current sentencing factors under §3553(a) must be determined through a hearing. Here, the court again errs by looking backwards at § 3553(a) factors relevant at sentencing-not currently. It is therefore error for the court to independently conclude § 3553(a) factors relevant at sentencing do not justify current sentencing relief, without also looking at current conduct factors.

c.      **This court's mercy is reserved for instances engendered by present circumstances.**

The Department of Justice and the courts have made preparations for relief by blending humanitarian and equity interests alike.

> "Compassionate relief matters. It matters so that courts may account for tragically unforeseeable events, as when an illness or disability renders proper care impossible while a defendant remains incarcerated,... It matters too, as present circumstances make clear, when public-health calamities threaten inmates with literal death sentences. It matters even when no crisis looms, but simply when continued incarceration would be "greater than necessary" to achieve the ends of justice. see, e.g. United states v. Maumau, 2020 U.S. Dist. LEXIS 28392, 2020 WL 806121 at 6 (D. Utah Feb. 18, 2020)(compassionate release may be justified even if "defendant is not suffering from any medical-or age-related physical limitations")."

And have also recognized;

> "Notably, the Department of Justice found that "defendants released through the compassionate release program are less than a tenth as likely to recidivate as the average federal prisoner." United States of America v. Osorto LEXIS 82661, 2020 WL 232038 at 5 (N.D. Cal. May 11, 2020)(citing

Department of Justice, Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program 49-50 (2013)(Inspector General Report), Moreover, it has estimated that "broader use of compassionate release could save taxpayers millions and free desperately needed space in BOP facilities. (citing Inspector General Report at 45-48).

**Conclusion**

Continued incarceration with the BOP under their current COVID-19 plan is lethal in consequence. The prison at Forrest City, and many others as cited by OSHA's investigators and DOJ-OIG inspectors, are unwilling to provide medical treatment to infected prisoners leaving them to self-diagnose and self-report their symptoms to staff. The prison's false reporting that inmates have 'recovered' and 'deny' experiencing symptoms only complicates this matter further. Perhaps these actions are taken by the BOP to hide the fact they are unable to contain the virus or isolate prisoners from its exposure, which accounts for the recent outbreak at Forrest City Low on 10/26/20. Truly, this virus has proven it does not discriminate between staff members and prisoners. This contagion nationally threatens our surrounding communities and families and FCI Forrest City serves as an accellerating vector for its dispersal under its current plan.

Because the defendant was denied a fundamentally fair adversarial proceeding- something due process requires, he respectfully asks the court to reconsider his request for the court to conduct a resentencing hearing to formally include COVID exposure as part of the new federal sentencing regime or to contemplate the necessity of compassionate release after being fully informed by competent counsel, the government, and by experts as their testimony applies materially to the claims presented.

## Conclusion

Bowen has shown that he is no longer safe at the prison for which he is assigned to serve his term due to the wide swath of deficiencies which exist in tandem with the raging COVID-19 infections. He has also shown that he is 'high-risk' as his physical health makes him more susceptible to serious injury or death should he be infected by the virus. But even if he weren't, his malignant cancer condition has likely cut short his life's term, a condition which he would be able to seek and recieve immediate treatment at one of his local VA facilities using his VA benefits.

Bowen's sentence has now become a death-sentence because he is unable to seek the type of medical care he requires to overcome his cancer and he will be unable to receive care for any Coronavirus infection he may receive should he additionally become infected while he has his cancer.

Bowen prays this court find he has medically qualified for RIS using the FIRST STEP ACT's criteria for terminal illness, serious medical condition, and extraordinary and compelling reason, and grant his request for compassionate release.

## Verification

I have read the foregoing Second supplement motion and hereby verify that the matters alleged herein are true, except as to matters alleged on information and belief, and as to those, I believe them to be true and correct. Executed at Forrest City, Arkansas on this 29th day of December, 2020.

/s/James Bowen
Defendant, Pro Se

## Certificate of Service

I certify under the penalty of perjury that the foregoing Second supplement motion was placed in the prison's internal mail system, postage pre-paid, for service upon this court via U.S. mail on this 29th day of December, 2020. Bowen asks this court's clerk to serve all other interested parties by electronic notification and to serve him with a stamped filed copy of this motion.

/s/James Bowen
James Bowen
Defendant, Pro Se